IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID STEVENS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 11-7216 |
| | : | |
| v. | : | |
| | : | |
| TELFORD BOROUGH, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**AMENDED MEMORANDUM**

**Jones, II, J.**                                    **August 14, 2014**

In his Second Amended Complaint, Plaintiff David Stevens ("Stevens") brought two

Counts, alleging, *inter alia*, civil rights claims under 42 U.S.C. § 1983 against Defendants

Telford Borough (the "Borough"), Randall Floyd and Mark Fournier (collectively,

"Defendants").  Pending before the Court are the cross-motions for summary judgment filed by

Plaintiff David Stevens (Dkt. No. 43) and Defendants (Dkt. No. 41), and the responses thereto.

After a thorough review of the record, and for the reasons set forth below, Defendants' Motion is

GRANTED and Plaintiff's Motion is DENIED.

I.    **Facts**

a.  **Stevens' Employment**

Plaintiff David Stevens ("Stevens") was hired as a part-time police officer outside Civil

Service regulations by Telford Borough (the "Borough") on June 2, 2008. (Def.s' SUF ¶¶ 1-2.)

Stevens was never a member of the Telford Borough Police Officers Association—the

bargaining unit which represents the Borough's full-time officers—nor a signatory of the

Collective Bargaining Agreement between the Officers Association and the Borough. (Def.s'

SUF ¶ 3.) Stevens was paid an hourly wage of $16.00 per hour, which later rose to $17.00 per hour. (Def.s' SUF ¶¶ 5-6). Stevens did not receive any healthcare or pension benefits from the Borough. (Def.s' SUF ¶ 7.). Additionally, Stevens held outside employment while working for the Borough. (Def.s' SUF ¶ 12.) [1]

While there is no express contract between Stevens and the Borough outlining the parameters of his employment, there was communication between the parties on this issue. Each year of his employment with the Borough—2008, 2009, and 2010—Stevens requested (and the Borough provided) letters stating that he was a part-time employee and was thus ineligible for Borough health benefits. (Def.s' SUF ¶ 14.) Additionally, on September 20, 2008 and again on March 23, 2010, Stevens signed a statement acknowledging that he received and understood the Telford Borough Police Department's Policy Manual and Rules and Procedures (the "Manual").[2] (Pl.'s SUF ¶ 2.) [3] Also, on two separate occasions, Stevens received memoranda from the chief outlining the supplemental and auxiliary nature of his position. (Def.s' SUF ¶¶ 16-17.)

---

[1] In Stevens' Counterstatement of Undisputed Facts, Stevens denies that he held outside employment during his tenure with the Borough—claiming that "it was clear Stevens would be in trouble if he didn't show up." (¶ 12.) This denial does not address the substance of Defendants' allegation of fact, nor is it supported by the record. Stevens supports his denial with a citation to his deposition. Def.'s Ex. 2, 79: 21-25, 80:1-3. Therein, Defense Counsel asked, "This much is clear and you would agree with me, there was never a time when you were directed to work a shift that you had been previously scheduled and you said I can't make it and the chief said you'll be in trouble if you don't show, correct?" Stevens responded, "No, that was never said." Defense Counsel asked, "That was never said?" Stevens responded, "No." Stevens erroneously cites this exchange as support for his denial. This section does not address Defendants' factual allegation—that Stevens worked for other employers during his tenure with the Borough. Defendants do admit that Chief Floyd discourages this practice (Pls. SUF ¶ 76), but maintain that he has permitted part-time officers to accept outside employment. (Def. CSUF ¶ 76.)

[2] The Manual—operative since its adoption by the Telford Borough Council in 1988—has not been significantly altered after its original adoption (Pl. SUF ¶ 5.)

[3] Much of the dispute between the parties centers on whether the Manual constitutes a contract (Pl.'s SUF ¶ 6; Def.s' CSUF ¶ 6.) At the outset, the Court notes that the parties' disagreement is not one of fact—but one of law. As such, it can and will be decided by the Court. To the extent there is a factual matter involved, it is—precisely stated—the breadth of the applicability of the Manual. Defendant contends that its enumerated list of misconduct applies to all officers, but its due process remedies do not. (Def.s'

Though Chief Floyd requested that the Borough Council hire Stevens as a full-time officer in the summer of 2010, ultimately the Borough Council declined to do so. (Def.s' SUF ¶¶ 26-27.)

### b. Events of August 18

On August 18, 2010, Stevens refused a shift offered to him by the Borough. He told the requesting officer that "he had not been feeling well and had other things to do." (Def.s' SUF ¶¶ 28-29.) That day, Stevens called Officer Minninger and told him that he observed fleas and flies in his house, and a mouse and snake in his bedroom. (Def.'s SUF ¶ 30.) He also stated that he might have been bitten by the snake. *Id.* Stevens, however, told Minninger that he was not sure whether he had been dreaming or awake during this episode. *Id.*[4] After speaking with Minninger, Stevens traveled to Home Depot and purchased chemicals to clear his house of pests. (Def.s' SUF ¶ 31.) [5]

Defendants assert that "Stevens stopped by the police station later that day while off-duty, and had a conversation with Detective Fox and Officer Minninger about what he thought happened that day." (Def.s' SUF ¶ 31.) Stevens denies this assertion, claiming that he was ordered by the senior officers to come to the station. (Pl.'s CSUF ¶ 33.) During his deposition, Stevens repeatedly testified that he was "asked" to "stop into" the police station. (Def.'s Ex. 2,

---

[4] CSUF ¶¶ 7, 9, 16.) On the other hand, Stevens contends that both the list and disciplinary remedies apply to all officers. (Pl.'s SUF ¶¶ 7, 9, 16.) Because the Court will ultimately conclude that, as a matter of law, the Manual is *not* a binding legal contract (see infra), the factual dispute over the sweep of its provisions is immaterial.

[4] Stevens denies this version of events. (Pl.'s CSUF ¶ 30.) However, his denial restates in almost word-for-word detail the events as stated by the Defendants. Stevens' denial states: "Officer Stevens told Minninger that he had observed flies and fleas in his house and he wanted to take care of them. Stevens' father testified that he had also seen the insects in the house and helped set off insect bombs. Officer Stevens says he thought he saw a mouse and a snake in his room but told his superior officer he wasn't sure if it was a dream or if he had been awake when it happened." *Id.*

[5] Stevens objects to the Defendant's characterization of the chemicals he purchased. This fact is immaterial. It does not matter whether he purchased "pesticides" (Def. SUF ¶ 31) or an "organic, pet safe, family safe pesticide." (Pls. CSUF ¶ 31.)

146: 22-23, 147:10-11, 148:1-2, 149:25, 150:1-2, 153:8-9). After Stevens appeared at the Police Station, Officer Fox indicated to Stevens that he should see the department physician, Dr. Bimson.[6] (Def.s' SUF ¶ 36.)

Even though Stevens did not believe that Fox had the authority to require that he see the physician, Stevens saw the departmental doctor. (Def.s' SUF ¶ 39.) During this meeting, Stevens described his gastro-intestinal issues, as well as the possible hallucinations to Doctor Bimson. (Def.s' SUP ¶ 40.) The doctor noted that he became "suspicious of a drug interaction or possible illicit drug use or alcohol abuse" by Stevens. (Def.s' SUF ¶ 41.) Subsequently, Dr. Bimson requested that Stevens take a blood test—an order with which Stevens never complied. (Def.s' SUF ¶ 42-43.)

After the incident, Stevens returned to work with a doctor's permission. There was no cause for additional concern until the morning of October 15, 2010. (Pl.'s SUF ¶ 13.)

### c.  Separation

On the morning of October 15, 2010 Stevens spoke with Officer Minninger during a shift change around 8:00 a.m. At the time of the meeting, Stevens admitted to feeling tired and lethargic. (Def.s' SUF ¶ 45.)  During the conversation, Stevens informed Minninger that he had ceased taking his medication and suffered a series of symptoms as a result: "1) difficulty maintaining train of thought; 2) problems sequencing of things he was doing; and 3) extreme fatigue." (Def.s' SUF ¶¶ 46, 48.) Later that day, Officer Minninger contacted Chief Floyd and apprised him of concerns regarding Stevens' behavior. (Def.s' SUF ¶ 49.) Stevens subsequently called Officer Minninger to inform Minninger that he was unable to work his scheduled shift the following day, October 16, 2010. (Def.s' SUF ¶ 51.)

---

[6] There is some dispute, based on Stevens' inconsistent testimony, as to whether Fox asked Stevens to visit the physician, or whether he indicated Stevens should see the physician. This dispute is immaterial.

Five days later, on October 20, Stevens met once more with Dr. Bimson. During that meeting, Bimson's notes again reflect his desire "to check labs to rule out metabolic abnormalities or illicit drug use" by Stevens. (Def.s' SUF ¶ 53.) Stevens testified that Bimson ordered him to have blood work done. (Def.s' SUF ¶ 54.) On the following day, October 21, Stevens went to Quest Diagnostics and underwent the ordered test. (Def.s' SUF ¶ 55.) Quest, however, misplaced the blood specimen. (Def.s' SUF ¶ 57.) On October 21, Officer Minninger drafted a memo addressed to Chief Floyd expressing concerns about Stevens' condition. (Def.s' SUF ¶ 58.)

On or about October 27, 2010, Chief Floyd met with Stevens at the police station. (Def.s' SUF ¶ 59.) During that meeting, Chief Floyd informed Stevens that he could take as much time away from the Department as he needed to address his health problems. (Pl.'s SUF ¶ 17.) According to Chief Floyd's notes following the meeting, Floyd asked Stevens to do three things before he came back to work: continue taking his medication, submit to a medical examination, and complete a psychological evaluation. (Pl.'s SUF ¶ 18.) There was no deadline given to Stevens for the completion of these tasks. *Id.*

On November 5, 2010 Chief Floyd traveled to Stevens' residence and insisted that Stevens come with him and take a drug test. (Def.s' SUF ¶ 63.) Stevens refused. (Def.s' SUF ¶ 64.)[7] Two days later, on November 7, 2010 Stevens received a message from Chief Floyd asking for his resignation. (Def.s' SUF ¶ 68.) During that message, Floyd stated, "I'm going to give you the opportunity to resign rather than be terminated. . . . .Please return all department equipment, your ID and anything TBPD related along with a letter of resignation." (Pl.'s Ex. 8.)

---

[7] Stevens denies this factual assertion on the grounds that "the testimony is not clear that the Chief informed the officer [Stevens] that the blood test had been lost on November 5, 2010." (Pls. CSUF ¶ 64.) This partial denial is separate from the material undisputed fact that Stevens did not accompany Chief Floyd for a blood test on November 5, 2010.

Before tendering his resignation, Stevens offered to take the blood test. (Pl.'s SUF ¶ 36.) However, on November 9, 2010, Stevens tendered his resignation. (Def.s' SUF ¶ 69.) Subsequently, at his deposition, Stevens testified that he never attempted to revoke his resignation, nor did he ever request a hearing to contest the circumstances surrounding his resignation. (Def.s' SUF ¶¶ 70-71.) On January 27, 2014, more than three years after his termination—and two years after the initiation of this litigation—Stevens attempted to withdraw his resignation from the Borough. (Pl.'s Ex. 18.)

Following the initiation of this litigation, Stevens alleges that he was told by New Hope Borough Police Chief Michael Cummings that it would be difficult for him to find another job as a police officer. (Pl.'s SUF ¶ 40.)   When asked about his search for employment, Stevens testified, "The first place I went to was New Hope Borough and I talked with Chief Mike Cummings. And I explained everything that happened. He said it was going to be—the chances were I wasn't going to be able to find any employment as a police officer with the litigation looming with Telford." (Def.s' Ex. 2, 264: 20-25.) [8]

## II.     Standard of Review

Under Fed. R. Civ. P. 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could

---

[8] Defendant denies Stevens' assertion on two grounds. First, Defendant objects because Stevens has introduced no sworn account of the conversation from Chief Cummings. (Def.s' CSUF ¶ 40). Second, Stevens testified that he, Stevens, informed Cummings about the pending litigation. *Id.*

return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322 23. A dispute is genuine if the fact finder could reasonably return a verdict in favor of the non moving party with respect to that issue. *Anderson*, 477 U.S. at 248. In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Seigel Transfer, Inc. v. Carrier Express*, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.    Discussion

### 1.    *Monell* Claim

In *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 692 (1978), the Supreme Court held that 42 U.S.C. § 1983 imposes liability "on a government that, under the color of some official policy, 'causes' an employee to violate another's constitutional rights." The dispositive issue initially before the Court is whether Stevens' possessed any cognizable constitutional right that his separation from the Telford Borough Police Department might have violated.  First, the Court will consider the asserted property right and then the asserted liberty right.

#### a.   Property Interest

Whether a government employee possesses a constitutional property interest in his employment depends on the law of the state that employs him. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (citing *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005)). In Pennsylvania, "a governmental employee only has a . . . property right in his employment where he can establish a legitimate

expectation of continued employment through either a contract or a statute." *Pipkin v. Pennsylvania State Police*, 693 A.2d 190, 193 (Pa. 1997); *see also*, *Barrett v. Ross Tp. Civ. Serv. Com'n.*, 55 A.3d 550, 556 (Pa. Commw. Ct. 2012) ("An individual has a property interest where he has an enforceable expectation under statute or contract."); *Guerra v. Redevelopment Auth.*, 27 A.3d 1284, 1290 (Pa. Super. Ct. 2011) (quoting *Scott v. Philadelphia Parking Auth.*, 166 A.2d 278, 281 (Pa. 1960) ("Tenure in public employment, in the sense of having a claim to employment which precludes dismissal on a summary basis is, where it exists, a matter of legislative grace.")). Thus, Stevens must point to a statute or contract that would confer upon him a legitimate expectation in continued employment. Before evaluating whether Stevens has met his burden, the Court must consider the contours of the employment relationship between the parties.

To determine whether a police officer hired in a part-time capacity—as Stevens admits he was—should be considered a full-time officer for termination process purposes, Pennsylvania considers whether the plaintiff was "available or on call for duty at any and all times." *Mullen v. Borough of Parkesburg*, 572 A.2d 859, 861 (Pa. Commw. Ct. 1990) (citing *Petras v. Union Twp.*, 187 A.2d 171 (Pa. 1963) (Full time employment "means being available for full employment; and full employment does not mean a hand at the helm through the entire voyage; it means standing by to take over.").

Although Stevens asserts a factual dispute regarding his availability, his deposition testimony demonstrates otherwise. Stevens' assertion that he was told to "make himself available at all times" is misleading. (Pl.'s SUF ¶ 78.) For support, Stevens cites his own deposition, where he testifies, "I believe Officer Fox repeatedly told me that the job of a part-time officer was to always be available." (Def.s' Ex. 2, 48: 12-14 .) However, Stevens does not cite to the rest of his

response. In the omitted testimony, Stevens states, "[Fox] told me that if I took the job, I wasn't going to be able to take vacations when everyone else took vacations because that's when they were going to need me and to plan on working most holidays." (Def.s' Ex. 2, 48:14-18). Thus, put in its proper context, Stevens' statement suggests that he must be prepared to take less favorable shifts—not that he must be ready to answer the call of duty whenever it may come.

Defendants assert that the Borough never told Stevens to hold himself on-call at all times. This allegation is supported by Stevens' own admissions. During Stevens' deposition, Defense Counsel asked Stevens, "Did Chief Bickel tell you you had to be available always?" (Def.s' Ex. 2, 52:8-9.) Stevens responded, "I don't specifically recall." (Def.s' Ex. 2, 53:10.) Defense Counsel then asked, "Chief Bickel did he ever tell you that you had to be on call twenty-four, seven?" (Def.s' Ex.2, 53:11-12.) Stevens replied, "No." (Def.s' Ex. 2, 53:13.). Subsequently, Defense Counsel asked, "Did anyone here with the police department or the borough during your entire employment with the Borough of Telford tell you that you had to be on call twenty-four hours a day?" (Def.s' Ex. 2, 53: 8-11.) Stevens' responded, "Dan Fox told me that I might get a call in the middle of the night to come in. They didn't specifically use the phrasing you were going to be on call 24 hours a day." (Def.s' Ex. 2, 53: 12-15.)

Defendants assert further that Stevens "did not consider himself 'on the clock' when he was not scheduled to work." (Defs' SUF ¶ 24.) Though Stevens denies this assertion,[9] it is confirmed by Stevens' own admissions. During his deposition, Stevens stated, "Do I think that someone I work with should be able to tell me what I do on my off time when I'm not working for them, no. If you want to be able to tell me what to do, they need to pay me for my time."

---

[9] Stevens denial asserts that "the actual testimony is that Stevens did not consider himself on the clock on his day off," (Pl.'s SUF ¶ 24).

(Defs.' Ex. 2, 185:22-25, 186:1.) Furthermore, Stevens admits his belief that his superiors "do not have the authority to tell [him] what to do on [his] day off." (Def.s' SUF ¶ 38.)[10]

Both parties agree, however, that *Stevens* made *himself* available to work additional shifts with the purpose of eventually obtaining full time employment with the Borough. (Def.s' SUF ¶ 23.) To that end, Stevens worked 40 or more hours in a week on occasion; however, his average hours per week never approached that number. In 2008, Stevens worked, on average, 32 hours per week. (Def.s' SUF ¶ 18.) In 2009, Stevens worked, on average, 29.8 hours per week. (Def.s' SUF ¶ 19.) From the beginning of 2010 until his termination in the fall of that year, Stevens worked, on average, 30.8 hours per week. (Def.s' SUF ¶ 20.) [11]

As is evident from Stevens' testimony, he did not consider himself available for duty at any and all times—even though he sought a full-time position. Stevens testified that he was never directed to be on-call twenty-four hours, seven days a week; that, in his opinion, the Borough could not exert any control over him when he was not on-duty; and, that he was never required to work a previously unscheduled shift under penalty of reprimand. Accordingly, this testimony demonstrates that Stevens did not consider *himself* to be able to "take over the helm" at any time. If he did not believe that the Borough could exert control over him when not

---

[10] Additionally, Defendants allege that "Stevens was not required to work when he was not scheduled." (Def.s' SUF ¶ 21.) Stevens denies this allegation, and instead asserts that "at times when he was not scheduled to work, he was directed to come into work anyway." (Pl.'s CSUF ¶ 21.) The dispute here centers on the interpretation of a portion of Stevens' deposition. Therein, Stevens was asked, "Were you ever directed to come in on a date that you were not scheduled to work." Stevens responded, "Yes." Defense Counsels asked, "Under penalty of reprimand?" Stevens responded, "No one ever said anything about reprimand but I was directed to come in and work on days I was not scheduled to work." (Def.s' Ex. 2, 79:5-12.)

[11] Initially, Stevens asserted that, over the summer, he worked, on average, more than thirty-five hours per week. (Pl.'s CSUF ¶ 19.) In a subsequent correction, Stevens asserted that he worked 34.2 hours per work. (Dkt. No. 55.) These corrections, however, did not include the period between August 12, 2010 and August 25, 2010.  The record demonstrates that, near the end of his separation from the Borough, Stevens averaged only 29.5 hours per week. (Def.s' Ex. 9.) This total is *less* than the admitted averages for both 2009 and 2008.

working, he could not have been a "hand at the helm" standing by to take over. Consequently, as a matter of Pennsylvania law, Stevens was not a full-time police officer.

In addition to availability, the *Mullen* court also supported its conclusion by citing the trial court's findings that the plaintiff was paid on an hourly basis (unlike the full-time officers), received no benefits, and did not work regular shifts. 572 A.2d at 861. Here, these same considerations support the Court's conclusion in the instant matter. Stevens admits that he did not receive a salary like the full time officers, but an hourly wage. (Pl.'s CSUF ¶¶ 5-6.) Stevens admits that he did not receive any insurance or other health benefits from the Borough. (Pl.'s CSUF ¶ 7.) Stevens admits that he worked irregular hours and, on average, less than the full time officers. (Def.s' SUF ¶¶ 18-20.) Stevens admits that each year of his employment he asked that the Borough provide him with letters stating that he was a part-time employee. (Pl.'s CSUF ¶ 14.) Given these admissions, it would be impossible for a rational fact-finder to conclude that Stevens considered himself a full time employee of the department within the meaning of Pennsylvania law.

In light of the foregoing, the Court must consider whether Stevens—as a part-time police officer—possessed a legitimate expectation of continued employment authorized by statute or created by contract.

### 1.     Statutory Rights of Part-Time Police Officers

Under the Pennsylvania Borough Code, 8 Pa. Con. Stat. § 1190(a)—which governs Telford Borough—"no person employed in any police . . . . force of any borough may be suspended without pay, removed or reduced in rank" except for a number of enumerated situations. Expressly excluded from the definition of "police force," however, are those "extra police serving from time to time or on an hourly or daily basis." 8 Pa. Con. Stat. § 1170.

11

Having admitted that he worked from "time to time" as well as on an "hourly or daily basis," it is clear that Stevens is specifically excluded by statute from the due process protections afforded to full-time officers. Moreover, Stevens has failed to cite any statute that would otherwise vest part-time police officers with any expectation of continued employment, and thus due process protection. Therefore, the court concludes that, as a matter of law, Stevens possesses no statutory basis upon which to claim a property interest.

>   **2.        Contractual Rights**

Initially, the Court notes that Pennsylvania has long-held that there is an "extremely strong presumption" in favor of at-will employment where there is no contractual relationship between the employer and employee. *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 286-287 (Pa. 2000). In Pennsylvania, an at-will employee "does not have a legitimate entitlement to continued employment because [he] serves solely at the pleasure of [his] employer." *Hill*, 455 F.3d 225, 234 (3d Cir. 2006) (quoting *Elmore*, 399 F.3d 279, 282 (3d Cir. 2005)). Accordingly, a part-time employee—in the absence of a contractual agreement to the contrary—can be fired for any reason at any time.

Stevens argues that Telford Borough Police Department's Policy Manual and Rules and Procedures (the "Manual") constitutes a binding contract between the Borough and Stevens, which vests in Stevens a continued right to his employment and abrogates Pennsylvania's presumption of at-will employment. Because the Court finds that the Manual did not constitute an employment contract, Stevens' argument fails. Thus, Stevens possessed no contractual right to continued employment with the Borough and remained an at-will employee at the time of his separation.

In determining whether a manual constitutes a binding contract in Pennsylvania, a court must ask whether "a reasonable person in the employee's position would interpret [a handbook's] provisions as evidencing the employer's intent to be legally bound and supplant the at-will rule." *Luteran v. Loral Fairchild Corp.*, 688 A.2d 211, 214 (Pa. Super. Ct. 1997); *see also, Martin v. Capital Cities Media, Inc.*, 511 A.2d 830, 842 (Pa. Super. Ct. 1986). This question not one of fact, but one of legal interpretation reserved for the court. *Ruzicki v. Catholic Cemeteries*, 610 A.2d 495, 497 (Pa. Super. Ct. 1992) ("[I]t is for the court to interpret the handbook to discern whether it contains evidence of the employer's intention to be legally bound."); *Reilly v. Stroehmann Bros. Co,.* 532 A.2d 1212, 1216 (Pa. Super. Ct. 1987) ("whether the employment handbook evidences an intent that it become a legally binding contract . . . is a question of interpretation and is therefore left to the court."); *Martin*, 511 A.2d at 841 ("It is for the court to interpret the handbook to discern whether it contains evidence of the employer's intention to be legally bound. . . . . " ).

Pennsylvania courts also require clear evidence of an employer's intent to abrogate the at-will presumption by means of the employee manual. *See Bauer v. Pottsville Area Emergency Med. Servs., Inc.*, 758 A.2d 1265, 1269 (Pa. Super. Ct. 2000) (" The handbook must contain a clear indication that the employer intended to overcome the at-will presumption."); *DiBonaventura v. Consolidated Rail Corp.*, 539 A.2d 865, 867 (Pa. Super. Ct. 1988) ("The at-will employment presumption will be overcome only if the employee can show with clarity and specificity that the parties contracted for a definite period"); *Martin*, 511 A.2d at 842 ("The at-will rule will not be overcome by vague or general promises in Pennsylvania.").

Stevens' claim fails as a matter of law because: (1) there is no clear evidence of the Borough's intent to abrogate the default rule and (2) no reasonable employee in his position

could interpret the Manual to do so. The Borough's Manual states that its purpose is "to give members of the Department a working guide; and for command personnel, a guide for disciplinary action." (Pl.'s Ex. 1, p. 7.) Additionally, the Forward (sic) states that the Manual is "the property of Telford Borough" to be updated as "amendments and additions are issued." *Id.* The plain meaning of the language is unambiguous—the manual exists to create predictability and consistency within the department, but is subject to unilateral amendment and does not necessarily obligate departmental decision-makers to act in a certain way. Moreover, it contains no clear or unambiguous language stating that the Manual is to be interpreted as a contract. Thus, it evidences no clear intent to legally bind the Borough and cannot be considered a contract.

Furthermore, a reasonable employee in Stevens' circumstances could not have reasonably expected that the employee Manual constituted a contract for continued employment with the Borough. On this point, the Court finds *Martin v. Capital Cities* to be particularly instructive.[12] In that case, the court rejected plaintiff's argument that her handbook constituted a contract abrogating her at-will employment. Plaintiff cited her employee handbook which listed a number of different causes for disciplinary measures. *Martin*, 511 A.2d at 835. The court found the list contained "nothing more than common sense enumerations of actions that any reasonable at-will employee would understand to generally call for disciplinary action." *Id.* at 838. The court determined that handbook was "an aspirational statement by the employer listing actions that generally will not be tolerated." *Id.*

---

[12] The Court notes that, where a Pennsylvania court has found an implied contract created by an employee handbook, there have been much clearer indications of intent. For example, in *Bauer*, the employee handbook stated that part-time employees would be treated as full-time employees after working a certain number of hours over a certain period of time. 758 A.2d at 1269. Here, the manual made no such promise.

A similar factual scenario is before this Court. Like the plaintiff in *Martin*, Stevens argues that the outlines of the disciplinary process in the Manual constitute a contract that provides him with a property interest. The court is unmoved for the same reason articulated in *Martin*. Given the presence of a Collective Bargaining Agreement which outlines a grievance process, the Borough's Manual functions as a common sense outline of the policies of the department—not a guarantee that the employee will only be terminated for "just cause." The Court acknowledges that the Manual does outline certain policies and procedures relating to the punishment of officers. However, given the special sensitivity of the relationship between a community and its law enforcement officers, any reasonable employee of the department—full time, part-time, or civilian—would understand that the contents of the Manual were designed to facilitate public safety, rather than abrogate an employee's at-will status. Moreover, such intent is clearly contradicted by the Manual's foreword, which states that it is a "guide" for employee policies.

The Court also notes that the factual context of Stevens' employment relationship with the Borough weighs against finding that the Manual constituted a contract. Stevens admits that he worked, on average, significantly fewer hours than a regular, full time police officer; that he worked irregular hours over the entire course of his employment; that he was passed over for full-time status in the summer before his separation from the Borough; and, that he sought and received from the Borough letters stating that he was a part-time employee every year of his employment. No reasonable officer similarly situated could interpret her Manual to create a contract guaranteeing her the same rights as a full-time officer. Thus, the Court concludes that the Borough Manual created no contract with Stevens sufficient to abrogate the at-will presumption.

Stevens also urges this Court to utilize the equitable doctrine of estoppel to prevent the Borough from denying the validity of the Manual as a contract. Stevens relies upon *DeFrank v. County of Greene*, 412 A.2d 663 (Pa. Commw. Ct. 1980). The court in *DeFrank* held that estoppel is "designed to preclude a party from depriving another of the fruits of a reasonable expectation when the party inducing the expectation knew or should have known the other would rely on it." *Id.* at 666 (citing *Commonwealth ex rel Gonzalez v. Andreas*, 369 A.2d 416 (1976)).

As a matter of law, the Court finds that Telford Borough made no representations to Stevens that could have induced him to reasonably conclude that his Manual granted him any right to his employment. The Borough's employee Manual—which Stevens acknowledged receiving, reading, and understanding on multiple occasions—states that "the booklet has been published to give members a "*working guide*" of departmental policies and procedures. This language clearly suggests that the Borough retained broad, unilateral authority to determine its policies and procedures. Additionally, the Borough gave to Stevens multiple letters stating that he was a part-time employee of the Borough.[13] Finally, Telford Borough declined to hire Stevens when full time positions became available. These undisputed facts constitute clear signals from the Borough to Stevens that he remained a part-time employee. Thus, he could not have rationally or reasonably been induced to interpret the Manual as an employment contract stating otherwise. Accordingly, his equitable estoppel argument fails.

Stevens also argues that his termination violates Pennsylvania public policy. The Court agrees that, in Pennsylvania, an at-will employee may bring suit against his employer in certain limited situations where "clear mandates of public policy" may be implicated. *McLaughlin*, 750

---

[13] That Stevens requested these letters does not alter the analysis. If Stevens requested the letters with the belief that he was full-time, he would have perpetrated a fraud on his insurance company by misrepresenting his employment status. Given that the Court must draw all reasonable inferences in Stevens' favor, it will instead infer that he sought these letters because he actually believed he was a part-time employee.

A.2d at 313 ("Exceptions to [the at-will] rule have been recognized only the most limited of circumstances, where discharges of at-will employees would threaten clear mandates of public policy.") (internal citation omitted).

In support of his assertion that his termination violates a clear mandate of public policy, Stevens quotes the *Appeal of Gagliardi*, 163 A.2d 418, 420 (Pa. 1960)  in his Memorandum in Support of Summary Judgment. Stevens argues that that case establishes the "*purpose of protecting officers* is 'to ensure the continuance in office of those individuals who are faithful and conscientious of their duties and to free these public officers from the fear of political and personal prejudicial reprisal.'"(Dkt. No. 43, p. 10) (quoting *Gagliardi*, 163 A.2d at 420.) Stevens' argument is not persuasive. The *Gagliardi* court was not describing the public policy animating the protection of part-time police officers, but the purpose of civil service system protections broadly—a system which, by his own admission, did not protect Stevens. Therefore, the Court finds his reliance on *Gagliardi* misplaced. This Court, being unwilling to interpret the laws of Pennsylvania beyond boundaries established by its courts, refuses to extend a public policy exception to the at-will rule to a part-time police officer.

There being no contractual or statutory exemption from the presumption of at-will employment, Stevens remained an at-will employee at the time of his separation from the Borough. Consequently, he possessed no property right and thus his separation from the borough—whether voluntary or involuntary—violated no cognizable constitutional property right.

### b.  Liberty Interest

Individuals possess a constitutional liberty interest in their reputations. *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) ("Where a person's good name, reputation, honor, or

integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."). "[T]o make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation *plus* some additional interest or right." *Hill*, 455 F.3d at 236 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976) (emphasis in original)).   In the context of public employment the stigma is "the creation and dissemination of a false and defamatory impression…and the termination is the 'plus.'" *Hill*, 455 F.3d at 236.

To satisfy the stigma prong, a plaintiff must show that the purported stigmatizing statements were both public and false. *Id*. at 236. With respect to publicity, "a protected liberty interest is not implicated if the government did not in fact disseminate any allegedly stigmatizing information to the public." *Chabal v. Reagan*, 841 F.2d 1216, 1223-1224 (3d Cir. 1988). The Supreme Court has found that, where the defamation is only alleged to have occurred in private, or through the legal process, a plaintiff cannot meet his burden to show stigmatization. *Bishop v. Wood*, 426 U.S. 341, 348-349 (1976). By contrast, in *Hill*, the Third Circuit found that the plaintiff properly pleaded the publicity prong of the stigma-plus test where he alleged the employer defamed him in Borough Council meetings and local newspaper articles.   455 F.3d at 236-237.

Though Stevens possesses a liberty interest in his reputation, there is no evidence that the Defendants disseminated any information regarding Stevens' termination. Stevens relies on a statement made to him by New Hope Borough Police Chief Cummings. Stevens claims that Cummings informed him that "chances were I wasn't going to be able to find any employment as a police officer with the litigation looming with Telford." (DEP. 264: 20-25). This statement in isolation is insufficient to raise a factual question regarding Defendants' conduct. Stevens has offered no evidence linking Chief Cummings' knowledge to the any actual publication or

dissemination by the Defendants. In fact, Stevens admits that *he* "explained everything that happened" to Cummings. (Def.s' Ex. 2,  264:20-25).  Stevens offers no other support for his assertion, and has therefore failed to show that the factual circumstances surrounding his termination were publicized by the Borough.

In light of the above, Stevens cannot, as a matter of law, satisfy the mandatory publicity element of the stigma test. Therefore Stevens failed to establish a *prima facie* deprivation of liberty claim.

## IV.    Declaratory Judgment

Stevens moves for Declaratory Judgment to force the Borough to reinstate him to his part-time officer position. (Dkt. No. 56.) The Declaratory Judgment Act permits a federal court to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). However, a court may only exercise this authority where there exists "a case of actual controversy within its jurisdiction." *Id.* Having granted summary judgment for the Defendants and thus dispensing with the only federal question before it, the Court possesses no further jurisdiction. Therefore, Stevens' Motion for Declaratory Judgment is denied.

## V.    Conclusion

Based on the undisputed facts of this case, summary judgment is appropriate for Defendants. Stevens has failed to demonstrate he possessed any constitutionally protected interest and that the Defendants violated his reputational liberty interest. Therefore, 42 U.S.C. § 1983 offers him no relief and summary judgment is granted in favor of the Defendants.

An appropriate Order follows.